UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| v. | ) Case No. 15-cv-1945 |
| | ) |
| ALLSTAR MARKETING GROUP, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint, alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57(b), 6102(c), and 6105(b).

3.      Venue is proper in this district under and 28 U.S.C. § 1391(b), (c), and (d), and 15 U.S.C.

§ 53(b).

## PLAINTIFF

4.　　The FTC, is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.　　The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A) & (B), 6012(c) and 6105(b).

## DEFENDANT

6.　　Defendant Allstar Marketing Group, LLC ("Allstar"), is a New York corporation with its principal place of business at 2 Skyline Drive, Hawthorne, New York, 10532. Allstar transacts or has transacted business in this district and throughout the United States.

## COMMERCE

7.　　At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

8.      Since at least 1999, Allstar has been in the direct marketing business, using televised commercials to sell a host of products. Over the years, Allstar has sold many products, including Magic Mesh, Cat's Meow, Roto Punch, Perfect Tortilla, Forever Comfy, and Snuggies.

9.      Consumers can purchase Defendant's products in retail outlets, by using an automated telephone system, or online at various websites operated by Defendant. Although Defendant's product offerings periodically change, the manner in which the company markets and sells all of its products is similar across product lines.

10.     Defendant's televised commercials for all of its products adhere to a nearly identical script. The commercials, which generally are approximately two minutes in length, begin by touting the products and their features. Nearly all of Defendant's products offered for purchase by telephone or online include a "buy-one-get-one-free" promotion.

11.     For example, in a recent Magic Mesh commercial, after the narrator describes the uses for Magic Mesh, the product is said to be available for "just $19.95." And, for "call[ing] now," Defendant promises consumers that it will "double the offer, just pay separate processing and handling fees." In referring to this "deal," the narrator says, "that's right, you get two Magic Mesh curtains for $19.95, that's less than $10 each."

12.     During the Magic Mesh commercial, the narrator never discloses that Allstar charges $7.95 for "processing and handling" for each Magic Mesh. Nor does the narrator disclose that it is not possible to decline the second "free" Magic Mesh, meaning that the minimum "processing and handling" fee that Defendant charges is actually $15.90. In reality, Defendant's undisclosed processing and handling fees nearly double the advertised cost of the Magic Mesh from $19.95 to $35.85. Defendant offers many of its other products in a similar manner.

13.    At the conclusion of its commercials, Defendant directs consumers to place their orders by calling a toll-free telephone number or by visiting a product-specific website.

**Telephone Purchases**

14.    Consumers who call Defendant's toll-free telephone number can purchase Defendant's products using an Interactive Voice Recognition ("IVR") system.  The entire ordering process is automated by IVR, prompting consumers for keypad or oral responses, with no option presented to speak to a live representative.

15.    Upon calling one of the toll-free numbers associated with Defendant's products, consumers are typically presented with several options:  1) they can proceed directly to ordering the product ("press 1," or say, "order"); 2) check the status of an existing order ("press 2," or say, "status"); 3) or hear more about the product for which they are calling ("press 3," or say, "information").

16.    Consumers who choose to order are immediately guided through Defendant's IVR ordering system, which is deceptive and misleading.  At the outset, consumers are instructed to input their name and address, followed by their credit or debit card number.  Defendant collects consumers' billing information – including the credit card or debit card number – before consumers have indicated how many products they are ordering and before Allstar discloses the total cost of consumers' orders.

17.    For instance, when ordering Defendant's Magic Mesh product, immediately after entering billing information, the recording announces, "Great, we have you down for one Magic Mesh set." Prior to this point, however, consumers have never indicated how many Magic Mesh products they would like to order.  Indeed, Defendant does not prompt consumers to enter a quantity of the

product they wish to purchase prior to collecting consumers' billing information. Defendant also does not disclose the total cost of consumers' orders prior to collecting consumers' billing information. Despite neither disclosing quantity nor price, however, Defendant immediately charges consumers who enter their billing information for at least one "set," which includes the buy-one-get-one-free promotion, of the main product being advertised.

18.     Once Defendant has captured consumers' billing information and subsequently charged them for the main offer, Defendant then offers consumers a series of "upsells," which are additional goods or services sold either by Defendant ("internal upsells") or by third parties ("external upsells"). As with Defendant's main offer, the ordering process for the various upsell offers is deceptive and misleading, and the total cost associated with the upsells is not disclosed during the telephone call.

19.     For example, during the Magic Mesh IVR ordering process, once consumers have entered their billing information, Defendant immediately offers consumers "additional sets" at a "great price." Consumers are then prompted to use the keypad or say the number of "additional buy-one-get-one-free" sets they would like. The cost of these additional sets is not disclosed during the upsell offer.

20.     The "additional sets" upsell offer is the first time in the telephone call that consumers are asked to enter a quantity of Magic Mesh they would like to order. Many consumers enter the total total number of Magic Mesh they would like to order, not just "additional" Magic Mesh sets. For example, many consumers who want to purchase just one Magic Mesh, may enter "one" at the prompt, intending to purchase the one Magic Mesh set that was the subject of the main offer (a "set" including the supposedly "free" ride along Magic Mesh). Instead of ordering one main

"set," however, consumers have just ordered an "additional set" of Magic Mesh by responding to this prompt, effectively doubling their order. As a result, Defendant charges consumers for Magic Magic Mesh products that they did not intend to order.

21.     After this initial upsell, Defendant subjects consumers to several additional upsell offers, including upgrading Magic Mesh sets to "deluxe" ("for just an additional $5 each"); lace valances ($14.99); easy reach plant pulley sets (set of 4 for $9.95); and an option to add priority processing to their order ($6.95). There is no way for consumers to bypass these upsell offers. Rather, Defendant prompts consumers to key in a quantity or to accept the offer verbally. For some upsell offers, Defendant does not present an option to decline the offer unless consumers remain silent at the prompt.

22.     Once Defendant has presented its internal upsell offers, it then, in some instances, transfers consumers to third parties for external upsell offers. In numerous instances, Defendant does not clearly and conspicuously disclose that the purpose of the upsell portion of the call is to sell goods or services. For instance, during the Magic Mesh ordering process, at the conclusion of Defendant's internal upsell offers, consumers are told, "Please hold for a live agent to hear about some very exciting rewards."

23.     Consumers are then subjected to additional external upsell offers presented by live third party operators. These offers include memberships in discount shopping clubs and for "free" Bahama cruises – offers which are not at all connected to Defendant's product. At the conclusion of these upsell offers, the telephone call ends.

24.     At no point during the IVR ordering process does Defendant inform consumers how many products they have ordered or the total cost of their order. Defendant does not give consumers

ordering over the telephone a chance to confirm or edit their purchase amount, including any upsells that may have been added.

25.     Defendant charges every consumer who enters billing information, even if those consumers abort the telephone call without completing their order. Consumers have complained that Defendant has charged them even after consumers have interrupted the telephone call by hanging up. These consumers never intended to complete a sale and would have had no way of canceling the transaction even if they had understood that Defendant was going to charge them.

**Online Purchases**

26.     Consumers can also purchase Defendant's products online. The product websites referred to in Defendant's commercials all share a similar design and ordering process. As with Defendant's telephone ordering process, Defendant's online ordering process is deceptive and misleading.

27.     Defendant's product website for Forever Comfy is illustrative of consumers' online ordering experience. The home page for Forever Comfy touts a "limited time web only special," which includes a "free bonus (Just Pay Separate P&H)" second cushion, and a "mystery gift," all "for only $19.95 + P&H."

28.     In fine print, at the bottom of the page (which would require scrolling for most consumers to view), Defendant provides the offer details:

> Get a Forever Comfy™ pillow for the unbelievably low price of just $19.95 plus $9.95 p&h. And that's not all. Order now, and we'll double the offer and send you a second Forever Comfy™ as a bonus, just pay separate $9.95 Heavy Duty p&h. Plus, during this limited time web only special, we'll include a mystery gift absolutely free! 30-day money-back guarantee (less p&h). Sales tax may apply. Allow 2-6 weeks for delivery. Additional $10 p&h for delivery outside of the continental US.

This is the only place that the cost of "p&h" is disclosed on the Forever Comfy website.

29.     To order, consumers can press an "Order Now" button, or navigate to the bottom of the home page to enter their billing information. In the case of Forever Comfy, Defendant asks consumers, "How many Buy One Get One FREE sets would you like today?" Consumers must choose a quantity from a drop down box. Next, consumers are directed to fill in their credit card information and their billing and shipping addresses.

30.     To proceed, consumers are to "click here," or, in other instances, click an "order now" button. Just as with the telephone order, Defendant immediately navigates consumers through a series of confusing upsell offers after consumers have submitted their billing information. Defendant does not adequately disclose that consumers already have placed an order for the main offer by submitting their billing information.

31.     On the Forever Comfy website, for instance, after consumers have entered their billing information, they are immediately redirected to a page that offers additional gel cushions, in small print saying: "To order additional Forever Comfy™ Gel Cushions, select the number of Buy One Get One Sets and click the YES button now!"

32.     The only indication that consumers already have placed an order is a message near the top of the page, amongst larger font, that reads: "Because you ordered today, you also qualify for this special offer." Many consumers either do not see this language or do not understand that this language means that they already have placed an order by submitting their billing information on the previous page. As a result, many consumers select again the number of "sets" they would like like to purchase as part of the main offer, which results in Defendant at least doubling consumers' orders.

33.     Defendant then proceeds to offer additional upsells, including the option to "upgrade" the order to a "deluxe" version at a cost of "$10 more per cushion;" to add an EZ Eyes™ Keyboard, also offered as a buy-one-get-one free for $19.95, with a "quantity" drop down box and a "yes" or "no" button to take advantage of the offer; GoJo™ Hands Free devices offered for $9.95 and in a similar buy-one-get-one-free fashion; "priority shipping" for $6.95; and, a "free shipping rebate," which redirects consumers to a third party website.

34.     Finally, at the conclusion of these multiple upsell offers, Defendant directs consumers to a page that lists the total purchase, with unit price, unit shipping, quantity, and total price descriptors of consumers' orders. Defendant also calculates consumers' "grand total," which is only "estimated" because Defendant does not calculate consumers' applicable sales tax. This is the first and only time that Defendant displays the complete order and the total (estimated) charge. At this point in the transaction, however, there is no way to edit, or cancel, the transaction online. Defendant's online ordering process hides the true cost of Defendant's products and upsells, causing consumers to incur charges that they never authorized.

35.     Further, Defendant effectively discourages consumers from calling to change or cancel their orders by advising them that Defendant's customer service will not have information on their order for twenty-four to forty-eight hours. Some consumers have waited twenty-fours before calling Defendant's customer service number to complain about an unauthorized order, only to be told that their order already has shipped.

36.     Finally, Defendant's refund policy makes it virtually impossible for consumers to receive a full refund for products they never intended to purchase in the first instance. Defendant's stated refund policy for many of its products is a "30 day money-back guarantee (less p&h)," even

though processing and handling can account for nearly half of consumers' purchase cost. Consumers have stated that when they have contacted Defendant to complain of being charged for too many products, Defendant has refused to issue full refunds and has directed consumers to return the unwanted products at consumers' own expense. In other instances, Defendant offers complaining consumers minor discounts in exchange for consumers keeping the unwanted products.

## VIOLATIONS OF THE FTC ACT

37. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

38. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

39. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### Unauthorized Charges

40. In numerous instances, Defendant has caused billing information to be submitted for payment without having obtained consumers' express informed consent.

41. Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

42. Therefore, Defendant's practices as described in Paragraph 40 above constitute an unfair

act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## COUNT II

### Failure to Adequately Disclose Material Terms of the Offer

43.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale or sale of Defendant's products, Defendant has represented, directly or indirectly, expressly or by implication that:

      a.   Consumers are able to purchase Defendant's products for a specified price, plus "processing and handling;" and

      b.   Defendant will then provide an additional product for free, plus "processing and handling."

44.     In numerous instances in which Defendant has made the representations set forth in Paragraph 43 of this Complaint, Defendant has failed to disclose or disclose adequately, prior to charging or billing a consumer, material terms and conditions of the offer, including:

      a.   The total number of products consumers are ordering;

      b.   The actual cost of "processing and handling;" and

      c.   The total cost of consumers' orders.

45.     Defendant's failure to disclose or disclose adequately the material information described in Paragraph 44 above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

46.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-08.  The

FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

47.     Defendant is a "seller" and/or "telemarketer" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2 (aa), (cc), and (dd). Although the TSR generally exempts "[t]elephone calls initiated by a customer or donor in response to an advertisement through any medium," 16 C.F.R. § 310.6(b)(5), this exemption does not apply to "any instances of upselling" during those telephone calls. *Id.* The TSR is therefore applicable to the "upsells" that Defendant offers to those purchasing Defendant's products over the telephone.

48.     "Upselling" is defined by the TSR as a solicitation of "the purchase of goods or services following an initial transaction during a single telephone call." 16 C.F.R. § 310.2(ee). "The upsell is a separate transaction, not a continuation of the initial transaction." *Id.*

49.     The TSR prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner, before a customer consents to pay for goods or services offered, the following material information:  the total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer. 16 C.F.R. § 310.3(a)(1)(i).

50.     The TSR requires telemarketers in an internal or external upsell to disclose truthfully, promptly, and in a clear and conspicuous manner the following information:

      a.     The identity of the seller;

      b.     That the purpose of the call is to sell goods or services; and

      c.     The nature of the goods or services.

      16 C.F.R. § 310.4(d)(1), (2), and (3).

51.     The TSR prohibits sellers and telemarketers from causing billing information to be

submitted for payment, directly or indirectly, without the express informed consent of the consumer. 16 C.F.R. § 310.4(a)(7).

52.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT III

**Failure to Disclose Total Cost**

53.     In numerous instances, in connection with Defendant's efforts to "upsell" various products or services, before a customer consents to pay for goods offered, Defendant has failed to disclose truthfully, in a clear and conspicuous manner, the following material information:  the total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer.

54.     Defendant's acts and practices as described in Paragraph 53 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(i).

### COUNT IV

**Failure to Make Required Oral Disclosures**

55.     In numerous instances, in connection with Defendant's efforts to "upsell" various products or services, Defendant has failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call that the purpose of the call is to sell goods or services.

56.     Defendant's acts and practices, as described in Paragraph 55 above, are abusive

Page 13 of 16

telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(d)(2).

## COUNT V

### Failure to Obtain Express Informed Consent

57.     In numerous instances, in connection with Defendant's efforts to "upsell" various products or services, Defendant has caused billing information to be submitted for payment without the express informed consent of the consumer.

58.     Defendant's acts and practices, as described in Paragraph 57 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(7).

## CONSUMER INJURY

59.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the TSR.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

60.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

61.     Section 19 of the FTC Act, 15 U.S.C. §57b, and Section 6(b) of the Telemarketing Act, 15

U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Federal Trade Commission, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

1.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, allowing for immediate access, and the appointment of a receiver;

2.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendant;

3.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

4.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

//

//

Respectfully submitted,

JONATHAN E. NEUCHTERLEIN
General Counsel

Dated: March 4, 2015

/s/ Rozina C. Bhimani
ROZINA C. BHIMANI
Federal Trade Commission
Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
rbhimani@ftc.gov

Attorney for Plaintiff
FEDERAL TRADE COMMISSION